Our next case, United States v. Wrobel and Stanislavczyk, Mr. Kazatsky. Good morning. My name is Mark Kazatsky and I represent Pawel Wrobel and I will be speaking for four minutes of the time and then Mr. Morris will be speaking on behalf of Mr. Stanislavczyk. Your Honor, the argument I wish to focus on is the first argument in regards to the jurisdictional element to establish a Hobbs Act violation was not proven in regards to the matter. His actions did not obstruct or affect interstate commerce in regards to this matter. How many diamonds were mined in the United States? Zero. Right. Where did the defendants come from? The defendants came from Poland. Or Chicago. Yes. And the extortion was alleged, the robbery was to be committed in New York. There was no extortion. So there are no diamonds from the United States, we have participants from Chicago and Poland about to commit a crime in New York and it's your position that this has nothing whatever to do with interstate commerce. That seems a little strange. Well, let me put it as this. We are not disputing that a diamond merchant is interstate commerce. Our second argument disputes whether in regards to this matter and also through the first argument that this was a diamond merchant. There was nothing offered by the government in regards to the specific individual in New York being a diamond merchant or involved in a business in regards to the matter. They put on an expert, dovetailing to the second issue, in regards to the matter who indicated that diamonds are mined outside the United States. A diamond merchant, a robbery of a diamond merchant would be interstate commerce. In regards to this, traveling across the United States to rob a citizen is a violation probably of New York law but not affecting interstate commerce. If it's a private citizen, it's not even a de minimis effect in regards to the matter on interstate commerce nor a realistic probability. The travel itself, which your Honor correctly notes, we believe, for example, in the government-cited case of Campbell, that any one piece specifically of evidence alone is enough to show interstate commerce. No court cited has indicated that just the mere travel to New York is enough for interstate commerce. Did they intend to rob a diamond merchant? Did they intend to rob a diamond merchant? No. Did the evidence show that they intended to rob a diamond merchant? The evidence indicated over the course of the time. It's a yes or no.  Yes or no, don't you understand? Did they intend to rob a diamond merchant when they left Chicago? They intended to rob somebody in New York. There was testimony and evidence in regards to a diamond merchant. Nothing in there to support the idea that they were going to rob a diamond merchant? No. There was support there. We argue that that main support shown at trial was not proper. Oh, there was evidence but you didn't like it. No. The expert that testified in regards to what diamond merchants were and then indicated what is. No, no. If we start with the premise that they were going to New York to rob a diamond merchant. Part of the plan. So that evidence is there. The fact that they didn't get to rob the diamond merchant wasn't their fault. They got pinched. No. Oh. They did get pinched. There was no proof that it was a diamond merchant. There was no proof that that's who. There was no proof that there was a specific person they were going for. There's no proof that the specific person was a diamond merchant. There was proof that he was a Hasidic Jew and the expert testified that a couple nationalities that are involved in this. There was evidence they were going to New York to rob a diamond merchant. They never got to him. That was the end of that. And you don't think that's enough for a Hobbs Act violation? Under the facts of this case, no. At least I understand your position. Yes. Okay. Thank you. Mr. Morris. Good morning. May it please the Court. Gareth Morris for Marek Stanislawczyk. Judge Pallmeyer proceeded properly and in the normal fashion in sentencing Mr. Stanislawczyk, who was pro se, who had not had a lawyer for, I think, about seven months, until she got to the point where Rule 32 required her to address the defendant personally in order to permit the defendant to speak or present any information to mitigate the sentence. And she didn't do that. The transcript confirms this error, which I think is a clear error. I don't think it has to be a plain error because I don't think there's a forfeiture here when a pro se defendant doesn't object that he never received a right. What is it the district court didn't do? The judge addressed him and said, and I quote, you are welcome to make a statement as well before a sentence is imposed. The judge said that and he made a statement. What was missing? What was missing, Your Honor, was this. And the sequence of the sentencing was as follows, and I will get specifically to that statement. No, you will get there now. What about that statement is inadequate? What's inadequate about it is that it's linked to the first statement the judge made on page 15. And I would ask you to look at that, page 15 of the sentencing transcript, where the judge says, what I would like to do now, this is after the guidelines are resolved, is for the government's, like to do now is ask for the government's arguments about what sentence is appropriate. And then, Mr. Stanislavich, you also will have the opportunity to make a statement before a sentence is imposed. So that's the first time the judge says he can make a statement. The government then goes on and makes a normal 3553 series of arguments. And then the judge says on page 18, and I would ask you to look at that too, the language you quoted at line 11, Mr. Stanislavich, you are welcome to make a statement as well before a sentence is imposed. What the judge did was give him, as his own attorney, the opportunity as well to make a 3553 statement. He then goes on for nine pages, as you saw, and covers all kinds of things. I'm still puzzled. What the rule says is that the judge, before imposing sentence, must address the defendant personally in order to permit the defendant to speak or present any information to mitigate the sentence. That's correct. That's the language of the rule. Now, in what respect did this invitation from the court not satisfy that language? Because the invitation was directed at the first part of the rule, which says that the court must provide the defendant's attorney an opportunity to speak on the defendant's behalf. The two times that he's invited to speak, he's speaking as counsel for himself. He's not separate people. It says it must address the defendant personally, the judge did that, to permit the defendant to speak or present any information to mitigate the sentence. I still don't see what the judge's statement didn't do. I think it could be anything. There was no limit on the information he could present. He would have been led by the flow of this transcript to believe that he should respond to the government's topic, which was 3553 issues. There's nothing to suggest that he was supposed to speak to mitigation. This is all in Polish, of course, and so it sort of looks better than it really is for him. I don't think the admonition was complete enough. I think that's right. That's your issue. I don't think there was an admonition. And if there was one, it wasn't worthwhile. That is correct. And the final point, two final points quickly. He does start to talk about mitigation only after she announces the sentence. And that also tells us that he didn't understand before that he was speaking to mitigation or allocuting. And the second point is he is to be released in January of next year. So if the court agrees with this point that he deserves a resentencing, which we believe he does, it should happen on an expedited basis. I was puzzled by the discussion in the summary of argument about the Brooklyn man and wore a black suit and so on, which misled the jury thinking that the Brooklyn man was an Orthodox Jew and thus a diamond dealer. What is all that about? Well, all Jews are diamond dealers. Judge, there's some very bizarre things in this case. That's a lot of swear words. I mean, this doesn't go to what... But what is this trying to say? I don't understand. I didn't write that. But what I will say is that they had very strange notions. They were in a van for several days traveling across the country. And they said that if a Jew was grabbed and taken into the van, the Jews would throw themselves in front of the wheels to stop, to protect their fellow. So I have no comment on that. How does that relate to theft? It doesn't. Thank you. You both were appointed, weren't you? Yes. Thank you. So, Ms. Bonamici? May it please the court. Deborah Bonamici on behalf of the United States. Good morning. Both defendants in this case were fairly convicted based on abundant evidence, particularly with respect to the interstate commerce element. As the court has already pointed out, the defendants believed that they were traveling to New York in order to rob a diamond dealer. And that evidence alone would have been sufficient. But the entire plan, the plan that was also attempted, involved interstate travel and the purchase of goods in interstate commerce, including a car rental. Did they have this notion that all they had to do to find in Brooklyn would be an Orthodox Jew? And that would mean he was a diamond dealer? No, that's absolutely not true. They had an address. They had an address for this individual's home. And they traveled to New York prior to the occasion when they went to do the robbery to case the area. And in doing that, they saw that it looked to be an Orthodox, from the way that people were dressed in the area, it looked to be an area where Orthodox Jews resided. The evidence was also that the information that they had obtained from a man named Alex, who was the intended victim's former business partner, was an Orthodox Jew. And so they expected him to be Jewish. They expected him to be a diamond dealer. And they expected him to live in a particular neighborhood at a particular residence. Because that's what they had been told by this fellow named Alex. So I'm not going to say that those conversations aren't. Who was Reichman? Wasn't there a mention of someone named Reichman? He's the intended victim. He is the Brooklyn diamond dealer? He's the man who lives in Brooklyn at the address. And during the trial, actually, the government presented evidence using Google Maps, demonstrating the area, you know, and showed photographs of the route and the area and all that. So there was a lot of evidence about this point. You know, if you kind of write this very carefully, it's going to be a Polish joke. Moving on. So what matters is, in a context of a conspiracy or attempt, is what the defendants believe. And the evidence was abundant that they believed their intended victim to be a diamond dealer. The district court did not abuse its discretion in admitting the testimony of Witness Donald Strefik. That testimony was originally presented to make the single point that, or was originally offered to make the single point that diamonds are not indigenous to the United States. As the trial proceeded and the defendants began arguing that all of the story was just made up nonsense and pure fantasy and that they really had no intent to commit the robbery, the government offered. Fortunately, the government doesn't have to prove this is a well-thought-out plan. Correct, correct, correct. So the government presented the additional evidence and the district court made the appropriate findings necessary to establish that the evidence was properly admitted. In any event, even if there were error, which there was not, any error would be harmless because the evidence the defendants killed in this case was absolutely overwhelming. Defendant Stanislavik was offered an opportunity for allocution just as you said, Judge Easterbrook. The statement that you quoted from the transcript at page 18 was the court's offer. The court was not obligated to do anything else. And during the statement made by the defendant that covered nine pages of transcript, the defendant in fact covered a whole host of points including arguments that were in mitigation regarding his professed innocence and many, many additional factors that were within the context of mitigation. So for all these reasons, the government requests that this court affirm the judgment. Okay. Thank you, Ms. Bonamici. So Mr. Kozadzki or Mr. Morris, do you have anything further? Your Honor, there was definitely a lot of talk in regards to this matter amongst the individuals involved, which was not really great talk in regards to expectations about individuals. However, at no time was the name of a specific individual given and no time was they know who a person was. It came down to when the expert testified as to his opinion as to who diamond merchants are and then at trial they are shown a picture of somebody who's at 19th and 54th who looks like what the expert said that that issue becomes muddied. But what they knew and what they didn't know in regards to the matter wound up being the farthest from the truth, including that they did not know a name. We ask the court to take that into account. Thank you for that. Okay. Well, thank you very much. Thank both of you. Wait, did you have something? Yeah, sure. No, I'm sorry. When Judge Pallmeyer said in both of her statements to the defendant, you may speak also, you may speak as well. She told him he was doing the same thing as the prosecutor and she never properly invoked Rule 32 and addressed him personally, which would be something that would not be done also. That's a separate right, a sacred right, and a right that every defendant has, and he should be granted it in this case. Well, he had a lawyer, didn't he? No, he did not. He had not had a lawyer for seven months. He was on his own. He had no lawyer at trial. He fired a lawyer. Yeah, several. There you go. He hasn't fired me yet. No, I work grateful to you. Okay, thank you.